***********
The undersigned have reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Stanback and the briefs and arguments of the parties. The appealing party has not shown good ground to reconsider the evidence, receive further evidence, rehear the parties or their representatives, and having reviewed the competent evidence of record, the Full Commission adopts the Opinion and Award of Deputy Commissioner Stanback with minor modifications.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. At the time of the alleged injury giving rise to this claim, the parties were subject to and bound by the provisions of the North Carolina Workers' Compensation Act. *Page 2 
2. At such time, an employment relationship existed between plaintiff and employer-defendant.
3. At all relevant times, the employer-defendant was a duly-qualified Self-Insured.
4. That all parties have been properly designated, and there is no question as to joinder or non-joinder of parties.
5. That the plaintiff sustained a compensable injury by accident on February 11, 2005, to his neck. The incident was accepted as compensable and an Industrial Commission Form 60 was filed on February 23, 2005, with the North Carolina Industrial Commission.
6. Plaintiff's average weekly wage is $364.72, which yields a compensation rate of $243.16.
7. Plaintiff returned to work on February 21, 2005, and a Form 28T was filed with the Industrial Commission. Plaintiff was taken out of work February 13, 2006, through February 27, 2006, and compensation was reinstated pursuant to Industrial Commission Form 62.
8. On February 28, 2006, plaintiff returned to work with the defendant at the same or greater wage and a second Form 28T was filed with the Commission.
9. The parties mediated the above case on July 11, 2007. At the time of the mediation, plaintiff was represented by counsel, and the settlement conference was conducted by a duly appointed mediator. An agreement was not reached between the parties.
10. Per the Rules of the North Carolina Industrial Commission, defendant paid the entire mediator's fee as a result of the July 11, 2007, mediation conference.
11. The issues presented by the parties at the hearing before the Deputy Commissioner were whether plaintiff's alleged conditions to his right and left shoulders and low back are causally related to the compensable work-related injury, what permanent partial *Page 3 
disability, if any, plaintiff is entitled to for his neck injury, whether plaintiff is disabled as defined by the North Carolina Workers' Compensation Act, and whether defendant is entitled to a credit for the overpayment of the mediator's fee resulting from the July 11, 2007, mediation.
12. The testimony of plaintiff and Sal Hot Lieng was taken at the hearing before the Deputy Commissioner. The stipulated exhibits consisted of the Pre-Trial Agreement (Stip. Ex. 1), NCIC Forms (Stip. Ex. 2), medical and rehabilitation records (Stip. Ex. 3), and Mediator's Report (Stip. Ex. 4).
 ***********
Based upon all of the competent evidence of record the Full Commission makes the following:
 FINDINGS OF FACT
1. On February 11, 2005, plaintiff sustained a compensable injury to his cervical spine when a carpet roll, weighing approximately 600 pounds, fell on his neck. At the time of this injury by accident, plaintiff was working for defendant as a housekeeping aide.
2. Defendant has accepted as compensable the cervical spine strain, but has denied plaintiff sustained a compensable injury by accident or that he suffers from a compensable condition to his right or left shoulders or lower back.
3. Plaintiff was initially treated at PrimeCare on the day of the accident and was diagnosed with neck pain. He was given some pain medication and released to return to sedentary work. On February 14, 2005, plaintiff returned to PrimeCare complaining of neck pain from the neck to the shoulders. The same work restrictions were imposed. On February 18, 2005, plaintiff's lifting restrictions were increased from five to ten pounds. Although plaintiff was released to return to work on the day of the injury and was never completely held out of *Page 4 
work, plaintiff did not return to work until February 21, 2005. Plaintiff returned to PrimeCare for follow-up treatment for his neck on February 27, 2005, March 8, 2005, and March 17, 2005. During the appointment on February 27, 2005, plaintiff complained of neck pain radiating into the left, but not the right, shoulder.
4. Plaintiff then underwent physical therapy at HealthSouth for his cervical pain from March 1, 2005, to April 21, 2005.
5. On March 23, 2005, plaintiff was evaluated by Dr. Rodney Mortenson at Sports Medicine and Orthopaedics Center. At this initial visit, plaintiff reported neck and upper back pain. A physical examination of plaintiff's neck revealed good range of motion with some tenderness in the back of the neck. Examination of his shoulders was completely normal. Impingement testing of the shoulders, which requires that the physician push the ball of the shoulder joint up against the joint, was normal as well. If the rotator cuff is torn or injured this test can cause pain.
6. X-rays of the cervical spine revealed wear and tear arthritis in plaintiff's neck at several levels, which were old injuries that took years to develop. An acute cervical sprain can cause pain that radiates from the neck into the trapezius area and all the way up and down the spine. Plaintiff's cervical sprain was related to the workers' compensation injury. Dr. Mortenson continued plaintiff's conservative treatment of medication and physical therapy. Dr. Mortenson opined plaintiff could continue working at full duty.
7. Plaintiff underwent an MRI on June 22, 2005, which revealed congenital cervical canal spondylolithesis resulting in multilevel spinal stenosis, most severe at C4-5. Competent medical evidence shows the MRI findings could not have been caused by the February 11, 2005 injury. *Page 5 
8. On July 11, 2005, defendant obtained a second opinion from Dr. Max Cohen at Greensboro Orthopaedic Center. Plaintiff reported aching and burning pain in the posterior cervical spine and intrascapular area with some radiation into the shoulders and lower back. Dr. Cohen diagnosed plaintiff with moderate radiographic spinal stenosis at C3-4 and C4-5, which Dr. Cohen opined was the etiology of plaintiff's ongoing pain symptoms. Plaintiff declined to pursue a surgical option.
9. Plaintiff was released at maximum medical improvement by Dr. Cohen on July 11, 2005, with a 5% permanent partial impairment rating to his back. Plaintiff was released to continue working at full duty with no permanent restrictions.
10. On July 19, 2005, plaintiff was evaluated by Dr. Kyle Cabbell with Guilford Neurological Associates. His examination of plaintiff focused solely on the neck. Dr. Cabbell measured the strength in plaintiff's upper extremities, checked his reflexes, and performed a general neurosurgical exam. The examination was normal; plaintiff scored five out of five strength in the upper extremities, which is objectively a normal exam. The exam of plaintiff's shoulders was also normal, and plaintiff did not complain of any right shoulder pain during the exam.
11. Dr. Cabbell recommended neck surgery, specifically a disc decompression. However, plaintiff did not want to pursue surgery. Therefore, Dr. Cabbell recommended continued conservative care and full duty work.
12. On February 13, 2006, Dr. Cabbell released plaintiff at maximum medical improvement with a 5% permanent partial impairment rating to his back.
13. On February 16, 2006, plaintiff was seen by Dr. Daniel Collins, where he reported neck pain bilaterally and into his right arm. Dr. Collins diagnosed plaintiff with diffuse *Page 6 
degenerative disk disease of the cervical spine and cervical facet syndrome. Plaintiff returned to Dr. Collins to follow-up on April 20, 2006, June 26, 2006, September 27, 2006, December 21, 2006, and March 21, 2007, where he reported relief with medication. During plaintiff's treatment with Dr. Collins, he never reported any right shoulder pain.
14. After eight months of seeking treatment with Dr. Cabbell and Dr. Collins, plaintiff returned to Dr. Mortenson on February 9, 2007. At this visit, Dr. Mortenson deferred opinion of all further treatment to Dr. Cabbell.
15. On March 9, 2007, on referral of his attorney and over two years after the injury by accident, plaintiff sought an opinion concerning his right shoulder from Dr. Arthur Carter. Plaintiff reported neck and shoulder pain resulting from his workers' compensation injury on February 11, 2005. Dr. Carter diagnosed plaintiff with cervical radiculitis, cervical arthrosis, and impingement syndrome in his shoulders.
16. Plaintiff returned to Dr. Carter on March 23, 2007, where he reported his pain had decreased and remained mainly at the base of his neck. Dr. Carter prescribed medication and work restrictions of no lifting, pushing or pulling greater than 50 pounds.
17. On June 1, 2007, plaintiff reported difficulty lifting and reaching with his right shoulder for the first time. Dr. Carter diagnosed plaintiff with impingement syndrome of the right shoulder. Dr. Carter then ordered an MRI to rule out a rotator cuff tear. The MRI of plaintiff's right shoulder, taken on June 6, 2007, revealed bursitis with extensive tendinopathy and at least a partial and possibly a full thickness tear along the anterior leading edge of the distal supraspinatus. According to Dr. Carter these results could be present because of plaintiff's age and simple wear and tear over the course of his life. Dr. Carter diagnosed plaintiff with a rotator *Page 7 
cuff tear in his right shoulder and right shoulder impingement syndrome on June 26, 2007. Plaintiff received an injection in his right shoulder, and was allowed to continue working.
18. On July 9, 2007, Dr. Carter assigned plaintiff an 8% permanent partial impairment rating to his neck and a 15% permanent partial impairment rating to his right shoulder.
19. Plaintiff suffered a "flare-up" in September of 2007. Because of this "flare-up" and the diagnosed rotator cuff tear, Dr. Carter recommended arthroscopic acromioplasty to the right shoulder, which plaintiff underwent on October 10, 2007. Surgery revealed that plaintiff did not have a rotator cuff tear. Instead, plaintiff only had an impingement, which required a decompression of the acromion. Post-operatively, plaintiff underwent physical therapy.
20. On November 9, 2007, plaintiff was involved in a motor vehicle accident. After this motor vehicle accident, plaintiff presented to Dr. Carter on November 21, 2007, with complaints of upper and lower back pain. These new complaints were unrelated to the workers' compensation injury and were solely related to the motor vehicle accident.
21. On November 21, 2007, Dr. Carter also examined plaintiff's shoulder. Dr. Carter diagnosed plaintiff with bursitis of the right shoulder and recommended continued physical therapy. Plaintiff returned to Dr. Carter to follow-up for the injuries he received in the motor vehicle accident on January 16, 2008. At this visit, plaintiff reported that his shoulder was doing better, and the examination of the shoulder was good. In terms of plaintiff's back injury from the motor vehicle accident, Dr. Carter diagnosed him with a dorsal and lumbar strain.
22. Plaintiff needed to be given a new post-operative rating to his shoulder by Dr. Carter. Plaintiff failed to produce any records to verify what that post-operative rating would be prior to the record closing. *Page 8 
23. Plaintiff did not report any pain or problems with his right shoulder for over two years after the injury. Plaintiff did not complain of any shoulder pain when he was initially treated at PrimeCare. At the initial appointment with Dr. Mortenson, he also failed to mention shoulder pain. When plaintiff presented to Dr. Cohen, he reported aching and burning pain in the posterior cervical spine and intrascapular area with some radiation into the shoulders and lower back. Plaintiff's complaints were of pain radiating into the shoulders and not shoulder pain. Furthermore, when plaintiff presented to Dr. Collins on February 16, 2006, one year after the injury by accident, he still did not report any shoulder pain.
24. The testimony of Sal Hot Lieng presented by plaintiff to corroborate initial an ongoing complaints of shoulder and back pain is given little weight. Mr. Lieng described trapezius pain, not shoulder pain. Furthermore, Mr. Lieng's testimony is biased as he had a workers' compensation claim against defendant, which involved an injury to his neck and shoulder also.
25. All exams of plaintiff's right shoulder for over two years were normal. At his initial appointment with Dr. Mortenson, on March 23, 2005, the examination of plaintiff's shoulders was completely normal. Impingement testing was normal as well. According to Dr. Mortenson an acute cervical sprain can cause pain that radiates from the neck into the trapezius area and all the way up and down the spine. The trapezius area is where plaintiff felt pain, not the right shoulder. During an examination on July 19, 2005, by Dr. Cabbell, plaintiff scored five out of five strength in the upper extremities, which is objectively a normal exam. The exam of plaintiff's shoulders was also normal, and plaintiff did not complain of any right shoulder pain during the exam. *Page 9 
26. Plaintiff did not report shoulder pain or receive a diagnosis related to the right shoulder until he obtained his own opinion from Dr. Carter, on referral of his attorney, two years after the injury. The March 9, 2007, appointment was the first time that plaintiff reported shoulder pain related to the workers' compensation accident. Dr. Carter provided the first diagnosis related to plaintiff's shoulder, which was impingement syndrome.
27. The greater weight of the medical evidence is that plaintiff's right shoulder symptoms are not related to the compensable work-related injury. While Dr. Carter's opinion is the only opinion relating plaintiff's shoulder condition to the work related injury his testimony is often contradictory and his opinion was speculative. Thus, his opinion does not constitute competent medical evidence.
28. Dr. Carter is not board-certified and was never tendered as an expert witness. Furthermore, he never gave any opinion concerning causation to a reasonable degree of medical certainty. Plaintiff's counsel inquired whether Dr. Carter had an opinion satisfactory to himself. It does not matter whether Dr. Carter is satisfied with his own opinion; the opinion must be to a reasonable degree of medical certainty or competent medical evidence. Dr. Carter was not in a position to make an opinion to a reasonable degree of medical certainty, as Dr. Carter testified he would defer to the opinion of the treating physicians at the time of the injury in 2005, regarding the nature and status of plaintiff's medical condition in 2005 and 2006. The initial treating physicians did not find any treatable problems with plaintiff's shoulder.
29. Dr. Carter did not see plaintiff until two years after the workers' compensation injury on February 11, 2005. Dr. Carter further admitted that what the initial treating physician may have seen immediately following the February 11, 2005, injury may be different from what Dr. Carter observed two years later. *Page 10 
30. Dr. Carter's opinion on causation and his credibility is contradicted by his own testimony of plaintiff's previous treatment. Dr. Carter admitted he was aware during the entire time plaintiff treated with Dr. Collins he did not mention shoulder pain. Dr. Carter knew Dr. Cabbell's exam of plaintiff's shoulder was normal and did not show signs of rotator cuff tear. Dr. Carter knew plaintiff's shoulder was normal during his treatment with Dr. Mortenson as well. Plaintiff complained of pain in the trapezius area while treating with Dr. Mortenson, which Dr. Carter knew was different from the rotator cuff area. With Dr. Cohen, plaintiff complained of pain in the intrascapular area, which Dr. Carter knew was also different from the rotator cuff. Dr. Carter also knew the pain radiating form the neck into the trapezius area that plaintiff complained of to Dr. Mortenson, would be consistent with C4-5 distribution of pain. In fact, Dr. Carter knew and agreed that during 2005, there were no signs of shoulder impingement and the shoulder exams were normal.
31. Dr. Carter also knew that if the workers' compensation injury caused impingement, then there should have been symptoms of impingement following the accident, including a positive impingement test. However, Dr. Mortenson performed an impingement test on March 23, 2005, and found no signs of a rotator cuff tear or impingement. Plaintiff did not even report mild pain in his shoulder.
32. Plaintiff has offered no evidence to prove that he has a left shoulder condition and that that condition is related to the compensable injury of 2005. The only mention of the left shoulder in the medical records was when plaintiff complained of neck pain radiating into the left shoulder on February 27, 2005. However, this complaint is not of shoulder pain, but of neck pain. In addition, at no point did he seek treatment or receive a diagnosis related to the left shoulder. Finally, plaintiff offered no expert testimony related to his left shoulder. Thus, *Page 11 
plaintiff failed to prove by competent medical evidence that his alleged left shoulder condition is related to the compensable workers' compensation injury of February 11, 2005.
33. Plaintiff's low back condition is not related to his workers' compensation injury. Plaintiff failed to seek treatment for his low back until over two years after the initial work-related injury. The first medical record that mentions the back is the initial PrimeCare visit on February 11, 2005, where plaintiff complained of neck and back pain. However, this record does not specify whether it was upper or lower back pain, and plaintiff was only diagnosed with neck pain. Plaintiff next complained of low back pain in July of 2005, when he was evaluated by Dr. Cohen, but again there was no diagnosis made related to the back. Dr. Cabbell's treatment also focused on the neck and no mention was made of low back pain. Even when plaintiff initially presented to Dr. Carter, there was no mention of low back pain.
34. It was not until after the motor vehicle accident plaintiff sustained on November 9, 2007, that plaintiff requested or received any treatment for his low back. After this motor vehicle accident, plaintiff presented to Dr. Carter on November 21, 2007, with complaints of upper and lower back pain. These new complaints were unrelated to the workers' compensation injury and were solely related to the motor vehicle accident.
35. Dr. Cohen and Dr. Cabbell both assigned plaintiff a 5% permanent partial impairment rating to his cervical spine. Dr. Cabbell is board-certified and specializes in the cervical spine. In addition Dr. Cohen and Dr. Cabbell both saw plaintiff shortly after the initial workers' compensation injury and assessed the ratings at the time of maximum medical improvement. In addition, while Dr. Mortenson did not assign a rating, he did defer to the opinion of Dr. Cabbell. There are three physicians who all agreed a 5% permanent partial impairment rating was appropriate. *Page 12 
36. Dr. Carter assigned an 8% permanent partial impairment rating to plaintiff's back; however, this rating is not as credible or competent as Dr. Cabbell and Dr. Cohen's ratings. Dr. Carter is not board-certified and was not tendered as an expert by Plaintiff. Dr. Carter does not assign ratings in workers' compensation cases too often, less than ten per year. Out of those ratings less than five would be for the neck. Furthermore, Dr. Carter does not even treat neck cases, unless the patient is an established patient. Finally, Dr. Carter testified he would defer to the opinion of the treating physicians at the time of the injury in 2005.
37. Plaintiff has not worked since September 19, 2007. Prior to that time he was paid all the indemnity compensation he was due related to the cervical sprain. Plaintiff had no physician's excuse from work from September 19, 2007 until the date of his shoulder surgery on October 10, 2007, and would not be entitled to benefits for this time period. From October 10, 2007, to November 11, 2007, Plaintiff was written out of work for shoulder surgery, which is not related to this claim. Thus Plaintiff would not be entitled to benefits for this time. From November 11, 2007 to January 16, 2008, Plaintiff was written out of work due to the unrelated injuries sustained in an unrelated motor vehicle accident.
38. Prior to September 19, 2007, plaintiff was working for defendant and earning the same or similar wages as prior to his injury by accident. Plaintiff voluntarily took himself out of the work force on September 19, 2007, for reasons not related to his compensable cervical sprain. Thus, plaintiff is not entitled to any indemnity compensation following September 19, 2007.
39. Plaintiff speaks Rhade, which is a dialect from Vietnam, and speaks little to no English. However, an interpreter was provided at all of his doctor's appointments after the initial PrimeCare visit on February 11, 2005. Therefore, language was not a barrier to plaintiff's *Page 13 
treatment of his workers' compensation injury. A translator who speaksRhade was also present to translate during the hearing.
40. The parties participated in mediation on July 11, 2007. Following that mediation defendant paid the entire mediator's bill pursuant to Rule 7(c), which included plaintiff's share.
 ***********
Based upon the foregoing findings of fact, the Full Commission concludes as follows:
 CONCLUSIONS OF LAW
1. Plaintiff's right and left shoulders and low back complaints and/or conditions are not causally related to his compensable workers' compensation injury of February 11, 2005. Plaintiff has the burden of producing evidence that his medical condition is causally related to the compensable injury to be compensated for such conditions under worker's compensation. Edmonds v. Fresenius Medical Care, 165 N.C. App. 811, 819,600 S.E.2d 501, 506-507 (2004), rev'd, 359 N.C. 313, 608 S.E.2d 755
(2005) (The Supreme Court adopted the dissenting opinion from the Court of Appeals.). Plaintiff failed to offer any competent medical evidence to prove his right and left shoulders and low back conditions and/or pain are causally related to his workers' compensation injury.
2. Plaintiff is entitled to a 5% permanent partial impairment rating to his cervical spine as assigned by Dr. Cohen and Dr. Cabbell, and agreed upon by Dr. Mortenson. N.C. Gen. Stat. § 97-31.
3. Plaintiff has not met his burden of proving he is disabled as a result of the workers' compensation injury of February 11, 2005, and thus, he is not entitled to ongoing benefits. Hilliard v. ApexCabinet, 305 N.C. 593, 595, 290 S.E.2d 682, 683 (1982). Because plaintiff's shoulder condition and subsequent shoulder surgery is not related to the workers' *Page 14 
compensation injury, plaintiff is not entitled to any further benefits for temporary total disability. Plaintiff has offered no evidence to prove any disability related to the compensable neck injury. N.C. Gen. Stat. § 97-29.
4. Pursuant to Rule 7(c) of the Industrial Commission Rules forMediated Settlement and Neutral Evaluation Conferences the cost for mediation is borne equally between the parties. Payment is to be made by defendants, including plaintiff's share and "defendant shall be reimbursed for plaintiff's share when the case is concluded from benefits that may be determined to be due to plaintiff, and defendant may withhold funds from any award for this purpose." Thus, pursuant to Rule 7(c) defendant is entitled to reimbursement from plaintiff of his share of the mediation fee.
 ***********
Based upon the foregoing stipulations, findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. Plaintiff's claim for workers' compensation benefits or medical treatment related to his right shoulder is DENIED.
2. Plaintiff's claim for workers' compensation benefits or medical treatment related to his left shoulder is DENIED.
3. Plaintiff's claim for workers' compensation benefits or medical treatment related to his low back is DENIED.
4. Plaintiff shall be responsible for all medical expenses related to his right and left shoulders and low back. *Page 15 
5. Defendant shall compensate plaintiff for a 5% permanent partial impairment rating to his neck and therefore shall pay to plaintiff permanent partial disability benefits at the rate of $243.16 per week for 15 weeks, subject to the attorney's fees awarded herein.
6. Pursuant to Rule 7(c) defendant is entitled to reimbursement from plaintiff of his share of the mediation fee in the amount of $306.25. This amount shall be deducted from the sum due for plaintiff's permanent partial disability award.
7. An attorney fee equal to twenty-five percent (25%) of the sums due plaintiff under Paragraph 5 of this AWARD is approved for plaintiff's counsel and shall be deducted from the amounts due plaintiff and paid directly to plaintiff's counsel in one lump sum.
8. Defendants shall pay the costs.
This the 16th day of April 2009.
S/___________________ DIANNE C. SELLERS COMMISSIONER
CONCURRING:
 S/___________________ CHRISTOPHER SCOTT COMMISSIONER
 S/___________________ LAURA K. MAVRETIC COMMISSIONER *Page 1